**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on January 3, 2006)

| | |
|---|---|
| **FLORIDA POWER & LIGHT COMPANY,** Plaintiff, v. **THE UNITED STATES,** Defendant. | No. 98-483C (Judge Baskir) |

**SECOND AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT**

Pursuant to RCFC 15(a) and RCFC 15(d), Plaintiff Florida Power & Light Company ("FPL"), by and through the undersigned counsel, alleges as follows:

**NATURE OF THE CASE**

1. FPL brings this lawsuit to recover significant damages caused by the Department of Energy's ("DOE") partial material breach of its unconditional obligation to begin disposing of spent nuclear fuel and high level nuclear waste (collectively, "SNF") generated by commercial nuclear power plants owned and operated by FPL. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), DOE and FPL entered into contracts in 1983 under which FPL has paid and continues to pay substantial fees in return for DOE's obligation to remove and dispose of SNF beginning no later than January 31, 1998. FPL has fully complied with its fee payment obligations under the contracts. DOE, however, has failed to perform its reciprocal obligation to dispose of SNF, and has stated that it will not do so until 2010 at the earliest. FPL has incurred and will continue to incur significant costs associated with

procuring additional SNF storage capacity and other damages as a result of DOE's total disregard of its contractual obligations.

## PARTIES

2. FPL is the owner and operator of Units 3 and 4 of the Turkey Point Nuclear Plant, located in Florida City, Florida, for which operating licenses were issued by the Atomic Energy Commission in 1972 and 1973, respectively. FPL also owns and operates Unit 1 of the St. Lucie Nuclear Plant, located in Fort Pierce, Florida, for which an operating license was issued by the Nuclear Regulatory Commission ("NRC") in 1976. FPL is the majority owner and operator and the Florida Municipal Power Agency and the Orlando Utilities Commission of the City of Orlando, Florida are the minority owners of Unit 2 of the St. Lucie Nuclear Plant, for which an operating license was issued by the NRC in 1983. FPL is acting on its own behalf and on behalf of the minority owners of Unit 2 of the St. Lucie Nuclear Plant in this action. All of FPL's nuclear plants have generated and continue to generate SNF, which is stored at the plant sites. FPL has entered into Standard Contracts for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contracts") with DOE pursuant to which DOE is to accept and dispose of the SNF generated by FPL's nuclear plants in return for payment of specified fees by FPL.

3. Defendant is the United States of America, acting through DOE.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1).

5. DOE's complete failure to comply with its essential contractual obligation to begin disposing of SNF by January 31, 1998, constitutes a material partial breach of its Standard Contracts with FPL, for which FPL may seek recovery of its damages without exhausting any

administrative remedies. In companion decisions handed down on August 31, 2000, the Federal Circuit has conclusively rejected the Government's exhaustion of remedies jurisdictional defense. See Northern States Power Company v. United States, 224 F.3d 1361 (Fed. Cir. 2000) ("Northern States"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) ("Maine Yankee").

6. Furthermore, Article XI of the Standard Contracts state, "Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, FPL is entitled to pursue its legal claims without exhausting any administrative remedies.

## FACTUAL BACKGROUND

### The Standard Contract

7. In 1982, Congress enacted the NWPA, codifying the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of commercial SNF. Pursuant to Section 302(a)(5)(B) of the NWPA, 42 U.S.C. § 10222(a)(5)(B), DOE was required to commence disposing of commercially-generated SNF no later than January 31, 1998, in return for the payment of fees by utilities and others that generated or held title to the SNF. The fees are paid into the Nuclear Waste Fund, which is the source of funds to cover DOE's costs for disposing of SNF.

8. Pursuant to Section 302 of the NWPA, in 1983 DOE developed the Standard Contract. The Standard Contract embodies the reciprocal obligations mandated by the NWPA, pursuant to which contract holders agree to pay fees into the Nuclear Waste Fund in return for the provision of SNF disposal services by DOE, beginning no later than January 31, 1998. See 10 C.F.R. Part 961.11. Specifically, the Standard Contract provides that "[t]he services to be

provided by DOE under this contract shall begin, after commencement of facility obligations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." 10 C.F.R. § 961.11, Art. II.

9. FPL executed its Standard Contracts with DOE on June 16, 1983. To date, FPL has paid approximately $419 million into the Nuclear Waste Fund pursuant to these contracts and continues to pay fees of approximately $20 million per year.

**DOE's Anticipatory Breach of the Contractual Deadline**

10. Notwithstanding the obligation imposed upon DOE by the Standard Contract, DOE failed to meet most of the early milestones established by the NWPA. These early failures eventually led to problems further along the program schedule, particularly in establishing the geologic repositories called for by the NWPA. At the same time, however, DOE continued to make commitments and representations that it would begin to dispose of SNF by the 1998 deadline.

11. For example, in a September 7, 1984 letter by Donald P. Hodel, then Secretary of Energy, to United States Senator J. Bennett Johnston, Secretary Hodel stated, "Pursuant to my authority, it is my intention that this commitment together with the overall thrust of the [NWPA], will create an obligation for [DOE] to accept spent fuel in 1998 whether or not a repository is in operation."

12. Similarly, in its 1987 Mission Plan Amendment, DOE announced that the geologic repository called for by the NWPA would not be available until 2003. DOE indicated, however, that it would be able to begin accepting SNF by 1998 at a Monitored Retrievable Storage ("MRS") facility designed to store SNF until commencement of repository operation.

13. Congress substantially amended the NWPA in 1987. As amended, the NWPA required DOE to focus its entire repository development effort on characterizing Yucca Mountain, Nevada, one of the earlier-identified candidate sites, to determine its suitability as the nation's first geologic repository. 42 U.S.C. § 10133. Congress also authorized DOE to construct a MRS but did not name a specific site. Rather, the NWPA provided two different options for siting a MRS. Under the first option, a MRS could be sited through the efforts of the Nuclear Waste Negotiator, an Executive Branch position created by the 1987 Amendments. 42 U.S.C. §§ 10242-10249. Under the second option for MRS siting, DOE was authorized to site and develop a MRS on its own, but on a schedule that was linked by the NWPA to the development of the repository. 42 U.S.C. §§ 10165(b), 10168(d).

14. By 1987, the repository program was more than ten years behind schedule. Despite the fact that in less than five years, the repository program had fallen ten years behind schedule, DOE relied solely on the efforts of the Nuclear Waste Negotiator for development of the MRS. DOE did not develop any contingency plans for meeting the January 31, 1998 deadline in the event that the Negotiator was unsuccessful, a state of events that continued even after the Negotiator's authority expired with the unsuccessful completion of his mission. Not surprisingly, DOE's waste disposal program fell further behind schedule.

15. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation") wherein DOE retreated from its earlier acknowledgments that it had an unconditional obligation to begin disposing of SNF by January 31, 1998. 60 Fed. Reg. 21973, 21974 (May 3, 1995). In its Final Interpretation, DOE stated that, since passage of the NWPA, it "has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998," and that it would commence disposing of SNF at a repository

by 2010 at the earliest. 60 Fed. Reg. at 21794. The Final Interpretation also stated DOE's conclusion that the NWPA does not impose an obligation on DOE to commence disposing of contract holders' SNF in 1998 in the absence of a disposal or interim storage facility. Id. at 21794-95.

**DOE's Breach of its Contractual Obligation**

16. FPL and other utilities filed in the U.S. Court of Appeals for the District of Columbia Circuit petitions for review of the Final Interpretation. The D.C. Circuit ruled in favor of the petitioners and held that the NWPA imposed on DOE an unconditional obligation to begin disposing of SNF by January 31, 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996). The Court further held that this obligation was reciprocal to the utilities' obligation to pay fees into the Nuclear Waste Fund. The Court remanded the matter to DOE for proceedings consistent with the opinion.

17. Notwithstanding the D.C. Circuit's unequivocal ruling, DOE advised FPL and other Standard Contract holders that it would not begin to dispose of SNF by the January 31, 1998, deadline. Specifically, DOE announced in a December 17, 1996 letter to contract holders "that DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." DOE further took the position that its failure to meet the deadline was excused because its delay was unavoidable.

18. In response to DOE's recalcitrance, FPL and other utilities filed another petition with the D.C. Circuit for a writ of mandamus to compel DOE to comply with the mandate in Indiana Michigan. In Northern States Power Co. v. United States, 128 F.3d 754 (D.C. Cir. 1997) ("Northern States I"), the D.C. Circuit reiterated that DOE had an unconditional obligation under both the NWPA and the Standard Contract to begin disposing of utilities' SNF by January 31,

1998. The Court also held that DOE had a clear duty to act in accordance with this unconditional obligation and issued a writ of mandamus precluding DOE from arguing that its failure to meet the January 31, 1998, deadline was unavoidable. On November 30, 1998, the United States Supreme Court denied DOE's petition for a writ of certiorari in the Northern States I case, 525 U.S. 1016 (1998).

19. Despite the ruling in Northern States I, DOE made no effort to meet the contractual deadline. DOE did not begin to dispose of SNF by January 31, 1998, as required by the NWPA and Standard Contract, and has maintained the position announced prior to the D.C. Circuit's rulings that it will not begin to dispose of SNF until 2010 at the earliest. DOE has failed and refused to provide any firm commencement date for the disposal of FPL's SNF.

20. In the Maine Yankee case decided by the Federal Circuit on August 31, 2000, the Federal Circuit concluded that DOE's admitted failure to begin accepting spent nuclear fuel by the January 31, 1998 contractual deadline constituted a breach of the Standard Contract. In the companion Northern States case, the Federal Circuit held that the unavoidable delays provision of the contract "does not bar a suit seeking damages for the Government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." Northern States, 224 F.3d at 1367. In summary, the Federal Circuit has determined as a matter of law that DOE breached the contract and that FPL and other similarly-situated utilities that are parties to the Standard Contract can bring an action for breach of contract damages in this Court.

**Nature of Damages Sustained by FPL as a Result of DOE's Breach**

21. As a direct consequence of DOE's disregard of its contractual obligations and defiance of the D.C. Circuit's rulings, FPL has been and will be forced to incur substantial additional costs to provide for extended on-site storage of its SNF. Moreover, FPL has incurred

and will continue to incur other substantial damages, including but not limited to regulatory costs associated with efforts to ensure sufficient on-site storage capacity or alternative off-site storage capacity to permit continued operation of its nuclear plants.

## CLAIMS FOR RELIEF

### COUNT I
### (Partial Breach of Contract)

22. Paragraphs 1 through 21 are incorporated herein by reference as if set forth in full.

23. FPL has complied and continues to comply with all of its obligations under the Standard Contracts, including the payment of all required fees into the Nuclear Waste Fund.

24. DOE has failed to perform its obligation under the Standard Contracts to dispose of SNF beginning no later than January 31, 1998, and thereby has partially and materially breached the Standard Contracts.

25. As a direct and proximate result of DOE's partial breach of the Standard Contracts, FPL and the minority owners of unit 2 of the St. Lucie Nuclear Plant have incurred and will incur substantial damages, in an amount to be determined at trial. The rate at which these damages will continue to accrue is dependent upon various factors including but not limited to when DOE commences performance of its contractual obligation, and FPL reserves all rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contracts.

**COUNT II**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

26. Paragraphs 1 through 25 are incorporated herein by reference as if fully set forth in full.

27. The Standard Contracts between FPL and DOE contain an implied covenant of good faith and fair dealing, pursuant to which DOE has a duty to perform its obligations under the contracts in good faith and not to take actions detrimental to FPL's contractual rights. DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF; by steadfastly attempting to avoid its obligations under the contracts as defined by the D.C. Circuit; by failing to make any effort to dispose of FPL's SNF or even to provide FPL with a firm date on which DOE will begin to do so; and by insisting on FPL's continued performance of its reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

28. DOE's failure to act has not been the result of inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its contractual obligations.

29. In contrast to DOE's failure to take any action to meet its contractual commitments, DOE has taken action to receive, transport and store SNF from other entities. For example, DOE continues to accept and store SNF from foreign research reactors.

30. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, FPL and the minority owners of Unit 2 of the St. Lucie Nuclear Plant have suffered and will continue to suffer damages as alleged above.

**COUNT III**

**(Taking Without Just Compensation)**

31. Paragraphs 1 through 30 are incorporated herein by reference as if set forth in full.

32. The Government was and is unequivocally obligated under the Standard Contracts to commence acceptance and disposal of FPL's SNF no later than January 31, 1998. By fully complying with its obligations under the Standard Contracts, FPL obtained a vested contract right to have the Government dispose of FPL's SNF in accordance with the terms of the contract.

33. The Government's failure and refusal to comply with the requirements of the Standard Contract for acceptance and disposal of FPL's SNF constitutes a taking of FPL's vested contract rights. In addition, the Government's failure to honor its commitments under the Standard Contract will prevent FPL from being able to decommission its nuclear plant sites and devote those sites to commercial uses as soon as it otherwise would have been able to do so. The Government's conduct has deprived, and will continue to deprive, FPL of the full valuable economic use of those sites, as well as the real property on which the SNF is stored and from which it cannot lawfully be removed.

34. FPL is entitled to just compensation for this taking of FPL's vested contract rights and this taking of FPL's real property in an amount to be determined at trial.

**SUPPLEMENTAL PLEADING**

35. Since the filing of the First Amended Complaint in 2000, FPL has continued to pay fees into the Nuclear Waste Fund of approximately $20 million per year. To date, FPL has paid approximately $500 million into the Nuclear Waste Fund.

36. Since the filing of the First Amended Complaint, FPL has incurred and continues to incur additional damages at its St. Lucie and Turkey Point plants, which damages arise from

the same continuing partial breach of FPL's Standard Contracts and continuing taking of FPL's property without just compensation by the Government.

37. Between October 2000 and continuing through November 2005, the following transactions, occurrences, and events, *inter alia*, took place as a direct and proximate result of the Government's continuing partial breach of FPL's Standard Contracts and continuing taking of FPL's property without just compensation: FPL upgraded the spent fuel pool crane at St. Lucie, purchased spent fuel pool cask pit racks at St. Lucie and Turkey Point, and made payments to the Private Fuel Storage project. Additionally, FPL incurred costs for engineering studies to explore its options on how to address the Government's continuing non-performance of FPL's Standard Contracts.

38. As a direct and proximate result of DOE's continuing partial breach of FPL's Standard Contracts, continuing taking of FPL's property without just compensation, and the actions taken in paragraph 37 above, FPL and the minority owners of unit 2 of the St. Lucie Nuclear Plant have incurred substantial damages in addition to those sought in its First Amended Complaint. The amount of these damages is to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Florida Power & Light Company respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(a) On Count I, for damages in an amount to be determined at trial;

(b) On Count II, for damages in an amount to be determined at trial;

(c) On Count III, for damages in an amount to be determined at trial;

(d) Pre-judgment and post-judgment interest as permitted by law;

(e) Costs of suit, including reasonable attorneys' fees as permitted by law; and

(f) Such other and further relief as this Court may deem proper.

Dated: January 3, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
Florida Power & Light Company

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)